**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONNA GATES,

          CASE NO. 16-12092
   *Plaintiff*,     DISTRICT JUDGE MARIANNE O. BATTANI
*v.*         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 21)**

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence

supports the Commissioner's determination that Gates is not disabled. Accordingly, **IT**

**IS RECOMMENDED** that Gates's Motion for Summary Judgment, (Doc. 16), be

**DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and that this case be

**AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned Magistrate Judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff Donna Gates's ("Gates") claim for a period of disability, Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et*

1

*seq.*, and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 21).

On September 14, 2011, Gates filed concurrent applications for DIB and SSI, alleging a disability onset date of May 18, 2011. (Tr. 296-309). The Commissioner denied her claims. (Tr. 128-45). Gates then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on October 24, 2012 before ALJ Beth J. Contorer. (Tr. 80-127). The ALJ issued an unfavorable decision, (Tr. 146-62), but the Appeals Council remanded the case, (Tr. 163-67), and instructed her to "obtain additional evidence concerning [Gates's] physical and mental impairments," "[e]valuate [Gates's] mental impairment in accordance with [proper] technique," "[g]ive further consideration to [Gates's] maximum residual functional capacity," and "obtain evidence from a vocational expert [("VE")] to clarify the effect of the assessed limitations" if "warranted by the expanded record, . . ." (Tr. 165). Gates had two further hearings on December 1, 2014, (Tr. 51-79), and February 10, 2015, (Tr. 34-50), respectively, where Gates testified. VE Diane Regan appeared at the former hearing, and VE Michele Robb appeared at the latter. (Tr. 34-79). The ALJ's written decision, issued March 25, 2015, found Gates not disabled. (Tr. 11-26). On April 5, 2016, the Appeals Council denied review, (Tr. 1-5), and Gates filed for judicial review of that final decision on June 8, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is

2

restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

3

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Gates not disabled under the Act. (Tr. 11-26). At Step One, the ALJ found that Gates last met the insured status requirements of the Social Security Act on March 31, 2013, and had not engaged in substantial gainful activity in the interval between her alleged onset date of May 18, 2011, and her date last insured, with the exception of "the third quarter of 2014." (Tr. 14). The ALJ thus tailored her findings to "the period prior to July 1, 2014 and after September 30, 2014, during which the claimant did not engage in substantial gainful activity." (*Id.*). At Step Two, the ALJ concluded that the following impairments qualified

as severe: degenerative disc disease in the spine, epicondylitis in the left arm and elbow, and schizoaffective disorder. (Tr. 14-15). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 15-17). Thereafter, the ALJ found that Gates had the residual functional capacity ("RFC") to perform sedentary work except that:

> she must be able to alternate positions between sitting and standing as needed, meaning that the job can be performed in either a sitting or standing position; she must be able to use a cane for walking and standing; she cannot do any overhead work with the left arm; she is limited to only occasional use of the left arm for all other tasks; she is limited to work that allows her to be off-task for up to 10-percent of the workday due to moderate limitations in her ability to maintain concentration, persistence and pace; she cannot do any work with the public; she is limited to only occasional contact with co-workers and supervisors and she cannot climb stairs.

(Tr. 17). At Step Four, the ALJ found Gates incapable of performing her past relevant work as a security guard. (Tr. 24). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (*Id.*).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Gates's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

Gates filled out a Function Report on October 29, 2011, which appears in the administrative record. (Tr. 348-55). Describing her conditions, she noted "severe back pain" from a herniated disc and annular tears. (Tr. 348). She also noted hemorrhoid "flair ups" and daily bowel problems. (*Id.*). She began her days by going to the bathroom, waking her sons up for school, and taking pain medications; "[a]fter assisting 9-year old with face, eye, hair, or grooming," she would "[w]ash up" and "[r]ead [the] Bible for healing." (Tr. 349). In caring for her children, "I sort clothes [to] be washed, put something frozen in the oven or make rice/potatoes of no [one] is coming to prepare or help cook. Help with homework." (*Id.*). She has help doing this. (*Id.*). Her pain and numbness in her legs, feet, and lower back disturbed her sleep, requiring her to take pain medications at night as well. (*Id.*). In activities of daily living, she struggled to get in and out of the tub without help, and suffered either "constipation, dealing with [hemorrhoids], or [diarrhea] from stool softener" when using the toilet. (*Id.*).

Gates could prepare food "if no [one] else can help," but hewed closely to "TV dinners, sandwich[es], noodles in a cup/add water." (Tr. 350). She could also perform certain household chores, such as wiping down the table and counter-tops. (*Id.*). Her "spinal herniated disc [and] annular tear," however, interfered with other chores. (Tr. 351). She remained able to drive a car and handle money. (*Id.*). When she drove, she went shopping for children's clothes and groceries, as well as medication. (*Id.*).

As hobbies, she listed reading the Bible and studying scriptures each day. (Tr. 352). She indicated she had "not been active socially at all" but would "try church [once or twice] weekly." (*Id.*). "I will try this week but had not been attending since I fell."

7

(*Id.*). She described being frustrated at the change in her routine, and at "not socializing at all." (Tr. 353). Prompted to mark abilities with which she had difficulty, Gates marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and getting along with others. She could walk from her door to her car and back before stopping to rest, which varied depending on the level of her back pain. (*Id.*). She cannot pay attention for long because "[t]he medicine makes me very drowsy," but she could follow written and spoken instructions fairly well. (*Id.*).

To assist with her conditions, Gates used crutches for numbness in her lower extremities, but used "the brace from the time I get up before standing[] [u]ntil I go to bed." (Tr. 354).

### ii. The October 24, 2012 Administrative Hearing

#### a. Gates's Testimony

Opening her testimony, Gates noted that she attained an Associate's Degree in Business Management from Baker College in June 2011. (Tr. 90). Though she "[t]ried to continue," she "ended up [un]able to get around or sit well, so I ended up in physical therapy." (*Id.*). "I wasn't able to sit and get around the college, so I had to drop it." (Tr. 91). She lived with her "two sons and myself." (*Id.*). Prior to 2011, she "helped with childcare and that was the way that I was making my money." (Tr. 93). Much of her work was intended to put children to work and "help" them "from trouble," such as committing crimes. (Tr. 94). She indicated that she changed the name of this business to "Harmony" since her fall, and that she did not get paid for the carpool services she continued to provide, "because if I did get some [money], it had to go into the gas tank, . . ." (Tr. 96).

In her prior job, Gates worked as unarmed security personnel and a customer service representative, though she had to stop working these jobs when her son's appendix burst. (Tr. 98). "I've really been back and forth with physical therapy. I may have tried to start to get back to work but then I would have a setback with my leg spasms, or the pelvic pain, or back pain, and the medicine makes me groggy." (Tr. 99).

In a typical day, Gates woke to "excruciating pain . . . ." (Tr. 100). She remained unable "to cook breakfast" and so her children would "throw me up a bagel before they go or something and like maybe a little Styrofoam cup of grits or something like that." (*Id.*). After her kids go to school, "I have symptoms from the medicine, so I have nausea, or the runs, headaches, you know, and then by the time when I clean myself up, I have to take a nap or something." (Tr. 101). She spent "[m]aybe two or three hours, probably a little more" napping each day. (Tr. 102). Her sons helped with the house work. (Tr. 103). She could drive her son to football practice several times a week, and drove other kids "[w]hen asked, not very often but when a parent has an emergency." (Tr. 105).

As to her back symptoms, Gates described problems "[m]ainly [in] my lower back toward the middle and sciatic nerve side then the right side, just all over back there, in the middle. It's like stabbing pains now, excuse me." (Tr. 106). Aside from physical therapy, she also sought "electrical shock-type" treatment, "water therapy," and "injection" therapy. (Tr. 107). She was forced to stop the latter form of treatment because "it made me gain weight and then that made my back even worse, . . ." (*Id.*). Her insurance recently kicked in and she planned on meeting further with a neurosurgeon. (Tr. 108). At

this point in the hearing, Gates described what medication she took for her various conditions, the cocktail of which could "sometimes . . . knock me out." (Tr. 110).

Despite her conditions, Gates indicated that she did not have a handicapped parking sticker. "Well I did try to ask for one and I don't know what happened for it. I didn't have the money. I just can't afford it." (Tr. 112). She indicated that she did not drive "very much . . . for a long time" because she signed up for "the physical therapy bus" to pick her up "and different things . . . ." (Tr. 113). She could stand "maybe 10, 15 minutes, however, the pain is so excruciating, I don't try to take myself to the limit of it." (*Id.*). "I don't try to lift anything. It feels like my back is going to come unglued just trying to take a step." (Tr. 114). "[M]ost of the time I just sit on the toilet and clean myself up." (*Id.*). In a typical night, she usually suffered "pain in my back and pelvic area and sometimes I have those leg spasms when I do finally doze off and then, you know, I try to keep my medicine nearby." (Tr. 115). Her sleep suffered as well: "It's just temporary, it's not like a restful sleep, it's just always temporary. I can go to sleep and think of the mess with the bills but it's always some kind of thing." (Tr. 116).

### b.     The VE's Testimony

The VE at this hearing was Elizabeth Pazakowski. She began by classifying Gates's past work as "hair braiding," (Tr. 117)—light by the DOT and sedentary with a sit/stand option as performed—"landscaping"—a semi-skilled, medium-exertion job— and "unarmed security guard"—with an SVP of 3 per the DOT but unskilled and light as performed.

The ALJ proceeded to ask her first hypothetical: "should not lift more than five pounds, or carry, lift or carry. Such a person can perform all postural activities occasionally except should never climb ladders and such a person should not have to climb more than three stairs at a time. Such a person should have the ability to walk with a cane. Such a person should be able to alternate between sitting and standing as necessary. Such a person can occasionally reach overhead and can frequently handle and finger. Such a person should not have to operate foot pedals. Such a person should avoid heights because of the effects of medication. Such a person retains efficient attention and concentration to understand, remember, and follow simple instructions. Can such a person perform any of Ms. Gates' past work?" (Tr. 119). The VE indicated that such a person could perform Gates's past work of hair braiding, and that other jobs existed in the national and regional economy, including: "video surveillance monitor"—with 1,400 regional job availabilities and 139,000 national job availabilities—"ID clerk"—with 1,200 regional job availabilities and 126,000 national job availabilities—and "[i]nformation clerk"—with 1,300 regional job availabilities and 129,000 national job availabilities. (Tr. 119-20). Responding to a second hypothetical, the VE noted that if that person "had to lie down throughout the day," such a limitation "would be preclusive of any full-time employment" and "would require a self-employment situation where everyone ran their own timeframes and depending upon the situation with respect to the hair braiding where she did it as needed, it could possibly be performed." (Tr. 120). Likewise, following the third hypothetical, the VE noted that "if such a person had to lie down throughout the day in addition to regularly scheduled breaks" for "two to three

hours," or "could not engage in any postural activities ever," such a limitation would preclude full-time employment. (Tr. 120-21). And if, in addition to these limitations, the individual suffered an epileptic condition causing spontaneous sleep, then "the only thing that could possibly be done is the self-employed work and that would just be whether or not the task could be completed within the expectation of the employer themselves and if they can't than [sic] they can't do it." (Tr. 123).

### iii.    The December 1, 2014 Administrative Hearing

#### a.    Gates's Testimony

In this hearing, Gates testified as to similar items, but her vocational history changed somewhat. She relayed performing "[l]ight industrial work" at Weber Automotive for "five weeks one time. And then I wasn't feeling well, so that assignment ended and then for about 10 days and I reinjured myself. And I can't work." (Tr. 58, 60). While there, she sprained her hand when "trying to move things with a . . . jack" and "tripped over it." (Tr. 60). She clarified that she worked at this job for ten days. (Tr. 65). She also confessed to needing help showering and grooming, as well as finding a permanent place to live. (Tr. 75-76). In other respects, the testimony as to her symptoms was largely unchanged from the prior hearing.

#### b.    The VE's Testimony

The VE at this hearing was Diane Regan. She classified Gates's child care attendant job as "semi-skilled and medium," her job as a security guard as "semi-skilled and light," and her job as a numerator as "unskilled and light." (Tr. 77). Industrial worker qualified as "unskilled and light." (*Id.*). The ALJ's first hypothetical posed an individual

"limited to sedentary work but" who "would need to alternate sit-stand as needed, would need the ability to use a cane, again as needed, for support when walking and standing. Occasional use of the left arm and no overhead use of the left arm, meaning up to a third of the day. No limitations on the right, which is the dominant arm. Moderate concentration, pace, and persistence limitations, 10 percent off-task. No work with the public and occasional with supervisor and coworkers, meaning up to a third of the day, and additionally no stair climbing. Could she do any of the past work?" (Tr. 77-78). The VE indicated that such an individual could not do any of Gates's past work. (Tr. 78). Other jobs, however, existed for such a person: "inspector"—with 2,000 regional job availabilities and 100,000 national job availabilities—"sorter"—with 1,000 regional job availabilities and 60,000 national job availabilities—and "[s]urveillance system monitor"—with 800 regional job availabilities and 60,000 national job availabilities. (Tr. 78). If that individual needed to nap "twice a day," however, such a limitation would preclude work. (*Id.*).

### iv.     The February 10, 2015 Administrative Hearing

#### a.  Gates's Testimony

At her final hearing, Gates elaborated a bit on her past work. She initially went back to work in January 2014 at "Sentech" for "[m]aybe four weeks until the assignment ended," performing "[l]ight industrial" work requiring her to "scan[] parts and enter something on the computer." (Tr. 40-41). When she was called back to work in March she injured herself after about ten days of work. (Tr. 42). Thereafter, from June to September 2014, she continued to work at "Sentech" but "they let me sit and get up and

13

stretch, and just they were trying to avoid me collecting workers' comp, I guess." (Tr. 37). She was given no assignments, and "they just tried to accommodate the times I could come." (Tr. 38). She went "between three or four" times a week for "maybe five" months. (*Id.*). She received approximately five weeks of workers' compensation after she left. (Tr. 44).

### b. The VE's Testimony

The VE at this hearing was Michele Robb. Though sworn in, she gave no testimony, and instead submitted a Vocational Interrogatory. The Interrogatory contains no analysis, merely checking a number of boxes indicating that no jobs existed in the national economy for a hypothetical individual with a RFC substantially similar to Gates's.

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including

symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2,

1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with

16

the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR

17

96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

18

### G.    Analysis

Gates offers numerous arguments she suggests warrant remand: (1) the ALJ "did not accurately consider" the "testimony from vocational experts that portrayed [Gates's] individual physical and mental impairments" even though they "were qualified as substantial evidence in support of [her] case" (Doc. 16 at ID 1353); (2) the ALJ "did not consider Dr. Feldman's expert opinion, which was based upon an objective standard," (Doc. 16 at ID 1355); (3) despite giving "some weight to the opinions of [Dr. Bagga and Dr. Zahurullah] who [had] treated [Gates] for her emotional problems," the ALJ nevertheless "failed to consider all of the factors related to [Gates's] emotional condition" such as her "delusional behavior, hallucinations and insomnia when evaluating the severity of [her] non-exertional impairments," (*Id.*); (4) the ALJ's decision "provides no indication that he [sic] applied the factors set out in . . . 20 CFR Sec. 404.1527(c)-supportability, consistency, specialization-when weighing the opinions of Dr. Feldman, Dr. Baggam [sic], Dr. Zahurullah and Dr. Yousuf," thereby "denot[ing] a lack of substantial evidence," (Doc. 16 at ID 1357); and (5) "[i]n making his [sic] credibility determinations, the [ALJ] failed and neglected to make specific findings and failed to consider the impact of the non-exertional impairments on [Gates's] ability to function," and that "[w]hen the [ALJ[ fails to consider all of the factors, exertional and non-exertional combined together the credibility determination more likely than not would be favorable," (Doc. 16 at ID 1358). I address each in turn.

### 1. The ALJ's Step Five Finding

In questioning the ALJ's occupational findings, Gates supposes that the ALJ "did not accurately consider" the available vocational opinions "which were qualified as substantial evidence in support of [her] case." (Doc. 16 at ID 1353). In particular, she avers that the ALJ "failed to consider the opinion of" VE Elizabeth Pazakowski "that [she] is unable to work," (Doc. 16 at ID 1352), and "failed to consider the Vocational Interrogatories that were sent to" VE Robb, (Doc. 16 at ID 1353).

At the onset, I note that the ALJ's consideration of VE Robb's interrogatories is laid bare in her opinion. (Tr. 25) ("Ms. Robb's responses to this Interrogatory have not been adopted, as they are inconsistent with her sworn testimony provided at the December 1, 2014 hearing.").[1] This particular objection, therefore, lacks merit.

In addition, the ALJ's vocational determination is supported by substantial evidence. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [the individual's] physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The limitations that VE Pazakowski identified

---

[1] I note that the ALJ cites, as reason for discounting VE Robb's Vocational Interrogatory, its inconsistency with "*her* sworn testimony provided at the December 1, 2014 hearing," even though VE Reagan provided the December 1, 2014 hearing testimony, not VE Robb. (Tr. 25) (emphasis added). This appears to be a scrivener's error, however, as VE Reagan—responding to a hypothetical mirroring the RFC in the ALJ's decision—thoroughly detailed jobs available in the national economy, and the ALJ's reliance on those figures shows she found VE *Reagan's* testimony more persuasive than VE Robb's Vocational Interrogatory. "From the ALJ's opinion and a review of the record, it is clear that the ALJ simply made a drafting error and that this error does not contradict the ALJ's ultimate findings. Such error is harmless." *Mcwhorter v. Berryhill*, No. 3:14-CV-01658, 2017 WL 1364678, at *2 n.2 (M.D. Tenn. Apr. 14, 2017).

as work preclusive—*e.g.*, an inability to "engage in any postural activities ever," (Tr. 121), and a need for two-to-three-hour unscheduled breaks throughout the day, (Tr. 120)—are not included in the RFC, and as discussed at length below, Gates offers no compelling arguments that the RFC is flawed. Absent such arguments, Gates should not prevail in challenging the ALJ's Step Five determination. *Cf. Gross v. Comm'r of Soc. Sec.*, No. 2:16-CV-10365, 2017 WL 1151099, at *5 (E.D. Mich. Mar. 28, 2017) ("Here, Plaintiff merely indicates that the ALJ's hypothetical 'failed to provide any of the supported limitations by Dr. Brennan,' and therefore was not supported by substantial evidence. Further, by framing her argument in this way, Plaintiff attempts to shift the burden of proof from herself to the ALJ, since the burden remains with the claimant through Step 4." (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)). Moreover, and as the Commissioner notes, Gates not only declines to challenge the ALJ's reliance on VE Regan's testimony, but also failed to object to her qualifications at the hearing—accordingly, she waived any argument that the ALJ erred in relying on VE Regan's testimony. *See Bondy v. Comm'r of Soc. Sec.*, No. 13-CV-14537, 2015 WL 1530435, at *14 (E.D. Mich. Mar. 31, 2015) ("None of the colloquy between counsel and the ALJ suggests that Plaintiff requested or intended to challenge the VE's qualifications or the foundation of the testimony, and counsel's failure to object or make an offer of proof . . . waives review."); *see also Burke v. Comm'r of Soc. Sec.*, No. CIV.A. 12-10193, 2012 WL 6967705, at *6 (E.D. Mich. Dec. 10, 2012), *report and recommendation adopted,* No. 12-10193, 2013 WL 396246 (E.D. Mich. Feb. 1, 2013) (upholding the ALJ's reliance on VE testimony because "the VE is assumed to be an expert about job

requirements," and the plaintiff, "despite being given the opportunity, decided not to challenge the VE's qualifications").

### 2.     Dr. Feldman's Opinion

After noting that Dr. Feldman is Gates's treating physician, she argues that the ALJ "did not consider" his "expert opinion" that she "was disabled, . . ." (Doc. 16 at ID 1355). This assertion overlooks, in absurd fashion, the thorough consideration given Dr. Feldman's opinions at numerous points throughout the ALJ's decision. *E.g.*, (Tr. 15) (referencing a note from Dr. Feldman showing that Gates "suffers post-traumatic depression"); (Tr. 19) (discussing Dr. Feldman's "progress notes" documenting "routine treatment for ongoing complaints of pain, including medication refills, without any significant abnormal objective findings"); (Tr. 20) (summarizing Dr. Feldman's medical opinion as to Gates's functional capacity, and explaining the reasons for granting it little weight); (Tr. 22) (mentioning Dr. Feldman's numerous conclusory findings that Gates was "disabled"); (Tr. 23) (explaining why Dr. Feldman's numerous conclusory findings that Gates was "disabled" should be afforded no weight).

Generously construed, Gates's argument may be read as criticizing the ALJ for failure to provide 'good reasons' in discounting Dr. Feldman's opinions—Gates furnishes no argument as to why the reasons given by the ALJ were not 'good,' nor does she outline how Dr. Feldman's opinion should have been reflected in the RFC. *See, e.g.*, *Lee v. Comm'r of Soc. Sec. Admin.*, No. 4:13-CV-01579, 2014 WL 4322817, at *11 (N.D. Ohio Aug. 29, 2014) (finding a similar argument waived because, "[i]n addition to her failure to acknowledge that the ALJ did in fact provide reasons for the weight provided to

Dr. Patel's opinion, Lee does not argue that the reasons provide [sic] were not 'good reasons.'"); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995))). At most, Gates points to "an MRI of [her] left arm confirming" the existence of her tendinosis, and notes that the ALJ considered this impairment to be severe at Step Two. (Doc. 16 at ID 1354-55). But "[t]he mere diagnosis" of a condition "says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *cf. Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 779 (6th Cir. 2008) ("[T]his court has held that the existence of . . . impairments does not alone lead to the conclusion that they are (or are not) severe.").

Without more developed argumentation, Gates's objection on this ground is without merit and the Court should discard it.

### 3.    The ALJ's Consideration of Gates's Mental Impairments

Gates next alleges that the ALJ "did not consider [her] delusional behavior, hallucinations and insomnia" when evaluating her non-exertional impairments. (Doc. 16 at ID 1355). She noted, as well, that Dr. Feldman diagnosed her with post-traumatic depression. (*Id.*). According to Gates, her "impaired" contact with reality "could prevent her from functioning in the work place." (Doc. 16 at ID 1356). Aside from a blanket citation to Gates's "Havenwyck records and the CNS treating sources," however, Gates

23

neither "cit[es] to *particular parts* of materials in the record" nor "show[s] that the materials cited do not establish the absence . . . of a genuine dispute, . . ." Fed. R. Civ. P. 56(c)(1)(A)-(B) (emphasis added). Moreover, the ALJ thoroughly considered—and discussed—Gates's mental health records, and provided valid reasons for discounting them. *E.g.*, (Tr. 21) (discussing Gates's GAF scores, mental status examinations, allegations of depression, and dearth of mental health treatment or medication); (Tr. 22) (recounting various "psychosocial stresses" that seem to have triggered Gates's mental health episodes); (Tr. 23) (juxtaposing Gates's normal mental health examinations with unreliably dire predictions from Dr. Yousuf, and noting that the RFC accounts for any proven difficulties "interact[ing] with others").[2]

Gates provides no support for her conclusory assertions as to her mental impairments, and the Court should not endorse her argument.

### 4.   The ALJ's Consideration of Dr. Feldman, Dr. Bagga, Dr. Zahurullah, and Dr. Yousuf

Gates asserts, without citation to the record, that the ALJ's decision "provides no indication that he applied the factors set out in" 20 C.F.R. § 404.1527(c) to the opinions of Dr. Feldman, Dr. Bagga, Dr. Zahurullah, and Dr. Yousuf. (Doc. 16 at ID 1357). The

---

[2] Gates also includes an argument that the ALJ should have "order[ed] an Independent Psychiatrist Evaluation for [Gates]" because "the only opinion [sic] that are available to rely on in regards to [her] mental impairment are from the doctors she sought treatment from." (Doc. 16 at ID 1356). She cites no authority for the proposition that an ALJ must order an independent psychiatric evaluation on behalf of a claimant who presents scant reliable evidence of disabling mental health impairments. *See, e.g.*, *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) ("'The burden lies with the claimant to prove that she is disabled.' . . . The ALJ has discretion to determine whether additional evidence is necessary. . . . Here, the ALJ's thorough opinion demonstrates that he carefully considered the entire record in this case, . . ." (quoting and citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001))). I find this argument waived.

only details approaching an argument included in her brief, however, show that each of these doctors rendered various diagnoses of mental health impairments, which Gates says the ALJ failed to consider. (Doc. 16 at ID 1354-55). As discussed above, Gates fails to support her argument as to Dr. Feldman and waives her argument as to the ALJ's failure to consider her mental impairments. So, too, does she waive this shapeless argument. *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *1 (E.D. Mich. Mar. 24, 2014) ("'It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived.'" (quoting *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005))).

### 5.     The ALJ's Credibility Determination

In her final argument, Gates lazily contends that "[i]n making his [sic] credibility determinations, the [ALJ] failed and neglected to make specific findings and failed to consider the impact of the non-exertional impairments on [her] ability to function." (Doc. 16 at ID 1357). Again, she fails to cite the record whatsoever. Perhaps this paucity serves a strategic function, albeit one without hope of success—a short glance at the ALJ's opinion discloses an exhaustive list of reasons for discrediting Gates's testimony. *E.g.*, (Tr. 18) (discussing certain testimony that "simply did not make sense"); (*Id.*) ("The claimant's lack of candor regarding her past work activity raises significant questions about the credibility of her subjective complaints."); (Tr. 19) (noting that Gates's attendance at college, while "not necessarily indicative of an ability to work on a full-time basis," still "tend[ed] to indicate that [her] impairments were not as functionally restrictive as she has alleged"); (Tr. 20-21) (noting Dr. Buchman's observation that Gates

"'put forth very little effort to the examination' and exhibited a general 'lack of effort,'" and finding it consistent with her "general lack of candor and vague, histrionic statements made during testimony in front of Administrative Law Judges."). Put simply, Gates's challenge on this count is not well taken.

For these reasons, the Court should not find Gates's argument on this ground persuasive.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Gates's Motion for Summary Judgment, (Doc. 16), be **DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local*

26

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 12, 2017                                S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 12, 2017                                By s/Kristen Castaneda
                                                  Case Manager